**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**SANDRA MONTGOMERY,**

           Plaintiff,

**v.**

                                       **CIVIL ACTION NO.: 3:16-CV-46
(GROH)**

**CAROLYN W. COLVIN,
Acting Commissioner of Social Security,**

           Defendant.

## REPORT AND RECOMMENDATION

## I. INTRODUCTION

On April 14, 2016, Plaintiff Sandra Montgomery ("Plaintiff"), through counsel

Scott B. Elkind, Esq., filed a Complaint in this Court to obtain judicial review of the final

decision of Defendant Carolyn W. Colvin,[1] Commissioner of Social Security

("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social Security Act,

as amended, 42 U.S.C. § 405(g) (2015). (Compl., ECF No. 1). On June 16, 2016, the

Commissioner, through counsel Helen Campbell Altmeyer, Assistant United States

Attorney, filed an Answer and the Administrative Record of the proceedings. (Answer,

ECF No. 6; Admin. R., ECF No. 7). On July 18, 2016, and August 16, 2016, Plaintiff and

the Commissioner filed their respective Motions for Summary Judgment and supporting

briefs. (Pl.'s Mot. for Summ. J. ("Pl.'s Mot."), ECF No. 10; Def.'s Mot. for Summ. J.

("Def.'s Mot."), ECF No. 13). The matter is now before the undersigned United States

Magistrate Judge for a Report and Recommendation to the District Judge pursuant to

---

[1] The undersigned notes that, on January 23, 2017, Nancy A. Berryhill became the
Acting Commissioner of Social Security.

28 U.S.C. § 636(b)(1)(B) and LR Civ P 9.02(a). For the reasons set forth below, the

undersigned finds that substantial evidence supports the Commissioner's decision and

recommends that the Commissioner's decision be affirmed.

## II.  PROCEDURAL HISTORY

On or about April 15, 2013, Plaintiff protectively filed a Title II claim for disability

and disability insurance benefits ("DIB") and a Title XVI claim for supplemental security

income ("SSI") benefits.[2] (R. 16, 216, 218). In both claims, Plaintiff alleges disability that

began on February 13, 2013.[3] (R. 16, 218, 224). Because Plaintiff's earnings record

shows that she acquired sufficient quarters of coverage to remain insured through

September 30, 2014, Plaintiff must establish disability on or before this date. (R. 17).

Plaintiff's claim was initially denied on June 5, 2013, and denied again upon

reconsideration on August 9, 2013. (R. 133, 145). After these denials, Plaintiff filed a

written request for a hearing. (R. 16, 151).

On October 14, 2014, a video hearing was held before United States

Administrative Law Judge ("ALJ") Jeffrey J. Schueler in Roanoke, Virginia. (R. 16, 30,

176). Mark Hileman, an impartial vocational expert, appeared and testified in Roanoke.

(R. 16, 30, 200, 203). Plaintiff, represented by Stephen F. Shea, Esq., appeared and

testified in Martinsburg, West Virginia. (R. 16, 30). On November 26, 2014, the ALJ

issued an unfavorable decision to Plaintiff, finding that she was not disabled within the

---

[2] Plaintiff previously filed applications for DIB and SSI benefits on September 2, 2008.
(R. 16). An administrative hearing was held on these claims. (Id.). However, on February 23,
2011, an ALJ issued an unfavorable decision to Plaintiff, finding that she was not disabled within
the meaning of the Social Security Act. (R. 63-80). On July 14, 2012, the Appeals Council
denied Plaintiff's request for review of the ALJ's decision. (R. 81-83).
[3] In her Title II application, Plaintiff originally alleged that her onset date was April 4,
2013. (R. 216). However, on May 21, 2013, Plaintiff amended her application to reflect an onset
date of February 13, 2013, the onset date that she alleged in her Title XVI claim. (R. 224).

meaning of the Social Security Act. (R. 13). On February 11, 2016, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner. (R. 1).

### III.    BACKGROUND

#### A.    Personal History

Plaintiff was born on June 7, 1971, and was forty-one years old at the time she filed her claims for DIB and SSI benefits. (See R. 85). She is 5 feet tall and weighs approximately 110 pounds. (R. 278). She lives in a house with her boyfriend. (R. 257, 287, 310). She completed school through the twelfth grade but has not received any specialized, trade or vocational training. (R. 279). Her prior work experience includes working as a food prep and sandwich maker, general warehouse laborer, deli clerk and activities aide for a nursing home. (R. 51). She alleges that she is unable to work due to the follow ailments: (1) a bulging disc and pinched nerve; (2) spinal stenosis; (3) carpal tunnel syndrome; (4) degenerative joint disease and (5) cardiac regurgitation. (R. 278, 299).

#### B.    Medical History

##### 1.  Medical History Pre-Dating Alleged Onset Date of February 13, 2013

On July 12, 2010, Plaintiff presented to the Shenandoah Community Health Center, where she received primary care. (R. 532). During this visit, Plaintiff complained of, *inter alia*, neck pain. (Id.). She explained that she suffers from congenital spinal stenosis and had undergone neck surgery in August of 2009 in an attempt to treat the pain. (Id.). After an examination, Plaintiff was diagnosed with degenerative disc disease

of the cervical spine and prescribed hydrocodone, Mobic and Flexeril for her pain. (R. 534-35).

On August 9, 2010, Plaintiff returned to the Shenandoah Community Health Center, complaining of back pain. (R. 529). She stated that, like her neck pain, her back pain is caused by her spinal stenosis. (Id.). After an examination, Plaintiff's pain medications were changed to Flexeril and sulindac. (R. 531).

On September 12, 2011, Plaintiff presented to the Panhandle Neurology Center, Inc., complaining of a sleep disorder. (R. 498). Plaintiff was evaluated by Karoly Varga, M.D. (Id.). Plaintiff stated that, since her childhood, she has kicked, talked, thrashed and tossed and turned in her sleep. (Id.). She also stated that she "[h]as been known to sleep walk." (Id.). Dr. Varga diagnosed Plaintiff with periodic limb movement disorder and somnambulism. (R. 500). To treat these sleep disorders, Dr. Varga prescribed Klonopin. (Id.).

On September 30, 2011, Plaintiff returned to Dr. Varga's office for a follow-up appointment. (R. 501). During this appointment, Dr. Varga documented that Plaintiff was experiencing a "good response" to Klonopin but that she was requesting a refill ten days early. (Id.). Dr. Varga further documented that Plaintiff would take an extra dose of Klonopin to fall asleep, even though Klonopin is not a sleeping pill. (Id.). Dr. Varga refilled Plaintiff's Klonopin prescription although he instructed Plaintiff that, if she continued to request early refills, then he would discharge her from his services. (R. 503).

Plaintiff continued to seek follow-up care from Dr. Varga over the following months. On December 8, 2011, Plaintiff informed Dr. Varga that "[e]verything [was]

good." (R. 504). On January 13, 2012, Plaintiff informed Dr. Varga that the Pain Management Center in Winchester, Virginia, where she received treatment for chronic pain, was opening a satellite office near her home and requested that Dr. Varga take over her pain treatment until the opening of the office. (R. 507, 509). Dr. Varga stated that he would consider doing so and prescribed Neurontin, Mobic and Flexeril for Plaintiff's pain. (R. 509). Dr. Varga also referred Plaintiff for aquatic therapy. (Id.). On February 10, 2012, Dr. Varga noted that Plaintiff had been receiving epidural steroid injections in her lower back from Dr. Gallagher at Fast Track Pain Management. (R. 510). Dr. Varga further noted:

> Asked specifically about if she has been to Urgent Care, ER or [a primary care physician] for pain meds since she stopped seeing Dr[.] Gallagher: 'I think maybe I went to the ER once.' . . . Reviewed Boar of Pharm: shows suspicious behavior. Pt didn't recall but one visit to ER for pain meds (has multiple visits and [prescriptions]). Will not [prescribe] narcotics.

(R. 510, 512). After documenting that Plaintiff "didn't go" to her aquatic therapy referral, Dr. Varga discontinued Plaintiff's Mobic prescription[4] but refilled her Neurontin and Flexeril prescriptions. (R. 512).

On March 19, 2012, Plaintiff presented to the emergency room at Berkeley Medical Center, complaining of chronic back pain. (R. 361). Plaintiff stated that she "d[idn't] have" a primary care physician because she "lost her medical card." (Id.). After an examination, Plaintiff was diagnosed with acute exacerbation of chronic low back pain. (R. 363, 369). She was provided prescriptions of Flexeril and Naprosyn and instructed to soak in warm water as needed for her pain. (R. 363-64).

Plaintiff presented to the emergency room at Winchester Medical Center periodically over the following months. On April 12, 2012, Plaintiff complained of a two-

---

[4] Plaintiff reported that the Mobic caused a rash across "her arms and trunk." (R. 510).

week-long headache that resulted from hitting her head on a table. (R. 402-03). After a

CT scan of her head revealed no abnormalities, Plaintiff was diagnosed with an acute

headache and prescribed Motrin and Tylenol #3. (R. 404-05, 410-11). On November 17,

2012, Plaintiff reported that she was prescribed tramadol for back pain but that the

tramadol was "not working" and had caused a rash on her arms and back. (R. 394-95,

398). Therefore, Plaintiff was provided Benadryl and prednisone for the rash and Norco

for her back pain. (R. 397). On December 24, 2012, Plaintiff complained of pain and a

"tingling" sensation in her back. (R. 384-85). After being diagnosed with acute low back

pain with radiculopathy, Plaintiff was prescribed, *inter alia*, Norco for her pain. (R. 386).

Plaintiff was also scheduled for an MRI of her lumbosacral spine, which revealed:

> 1.  At L4-L5, there is mild to moderate spinal stenosis resulting from a
> posterior disc bulge and ligamentum flavum and facet hypertrophy and
> moderate biforaminal narrowing, right worse than on the left.
> 2.  At L3-4 and L5-S1, there is mild posterior disc bulging and bilateral
> facet hypertrophy.
> 3.  Additional degenerative changes as described above.
> 4.  When compared to the prior MRI scan of the lumbosacral spine from
> February 1, 2009, there is no definite interval change.

(R. 382-83).

On February 20, 2013, Plaintiff presented to the emergency room at Berkeley

Medical Center, complaining of severe left flank pain. (R. 350-51). After an examination,

a CT scan of Plaintiff's abdomen/pelvis was ordered, the results of which were normal.

(R. 250-51). Therefore, Plaintiff was diagnosed with back/flank pain and prescribed

Norco for her pain. (R. 356). Plaintiff was also instructed to apply ice/heat as needed to

her back/flank and to follow-up with a primary care provider. (Id.).

### 2. Medical History Post-Dating Alleged Onset Date of February 13, 2013

On March 4, 2013, Plaintiff presented to the Shenandoah Community Health Center to re-establish care. (R. 413). During this visit, Plaintiff complained of worsening chronic back pain and requested a referral for pain management. (Id.). During an examination, a cardiac murmur was discovered. (R. 415). Therefore, an echocardiogram was ordered, which revealed, *inter alia*, mild aortic regurgitation. (R. 359). At the end of the examination, Plaintiff was diagnosed with spinal stenosis, degenerative disc disease of the cervical spine and an aortic valve disorder. (R. 416). Plaintiff was noted to be a smoker and was encouraged to quit smoking. (Id.). Plaintiff was prescribed Flexeril and Sulindac for her pain and referred to pain management. (Id.).

On April 2, 2013, Plaintiff presented to the emergency room at Winchester Medical Center, complaining of neck pain and left arm numbness. (R. 372-33, 376). After an examination, Plaintiff was diagnosed with acute neck pain with radiculopathy. (R. 372). Plaintiff was prescribed Flexeril for her pain and scheduled for an MRI of her cervical spine, which revealed "[n]o acute abnormality with stable chronic changes." (R. 375, 378, 380).

On May 9, 2013, Plaintiff presented to the Center for Orthopedic Excellence, complaining of bilateral wrist and arm numbness and tingling. (R. 473). Plaintiff stated that the numbness and tingling began in 2008 but was "getting worse." (Id.). Plaintiff also stated that her left arm symptoms were more severe than her right arm symptoms. (Id.). Thomas E. Knutson, Jr., D.O., evaluated Plaintiff on this occasion. (Id.). Dr. Knutson diagnosed Plaintiff with paresthesias of the upper extremities and ordered

nerve conduction tests. (<u>Id.</u>). When Plaintiff subsequently underwent the nerve conduct

tests, the tests revealed "bilateral median neuropathies at the wrists[,] . . . ulnar

neuropathies across the elbows . . . [and] chronic bilateral multilevel C radiculopathies."

(R. 427).

In May of 2013, Plaintiff presented to an emergency room at an unspecified

hospital, complaining of right hip pain. (R. 421). Plaintiff was diagnosed with right hip

arthritis and referred to Nyagon G. Duany, M.D., an orthopedic specialist. (<u>Id.</u>). On May

16, 2013, Plaintiff presented for her referral appointment. (<u>Id.</u>). After an examination, Dr.

Duany confirmed the diagnosis of right hip arthritis and prescribed naproxen and a

Medrol Dosepak. (<u>Id.</u>). Dr. Duany also referred Plaintiff to physical therapy. (<u>Id.</u>). Finally,

Dr. Duany noted that Plaintiff was "not interested in surgery" and that, therefore, she

was only being treated "conservatively." (<u>Id.</u>).

On May 20, 2013, Plaintiff presented to Dr. Varga's office to re-establish care. (R.

424). Plaintiff stated that she had stopped seeking treatment because she lost her

medical card. (<u>Id.</u>). Plaintiff further stated that her Klonopin prescription, which Dr. Varga

had previously ordered, "had controlled [her] symptoms well" and that she wanted

another prescription, which Dr. Varga provided. (R. 424, 426).

On June 13, 2013, Plaintiff returned to Dr. Knutson's office for a follow-up

appointment. (R. 461). During this appointment, Dr. Knutson diagnosed Plaintiff with

carpal tunnel and cubital tunnel syndromes and scheduled her for surgery. (<u>Id.</u>). On July

2, 2013, Plaintiff presented to the Tri-State Surgical Center, where Dr. Knutson

performed a carpal tunnel release of Plaintiff's left wrist and an ulnar nerve

decompression of her left elbow. (R. 430, 432, 477). Afterward, Dr. Knutson

documented that Plaintiff had "tolerated the procedure well without complications." (R. 478). When Plaintiff presented to Dr. Knutson's office for a follow-up appointment after the surgery, Dr. Knutson recorded that Plaintiff was doing well overall and that her paresthesias were gradually improving. (R. 471).

Plaintiff presented to Dr. Varga's office several times in the late months of 2013. On August 1, 2013, Dr. Varga prescribed Flexeril and refilled Plaintiff's prescription of Klonopin. (R. 490, 492). On August 27, 2013, Dr. Varga noted that Plaintiff's somnambulism was "doing better" and that Plaintiff was sleeping restfully at night. (R. 487). Dr. Varga further noted that Plaintiff's spinal stenosis is her "major problem." (Id.). In addition to Plaintiff's Flexeril and Klonopin prescriptions, Dr. Varga started Plaintiff on a trial of naproxen and referred her for aquatic therapy. (R. 489). After Plaintiff presented for her aquatic therapy initial evaluation, she was ordered to participate in therapy twice a week for four weeks. (R. 485-86). On December 2, 2013, Dr. Varga documented that Plaintiff was "happy with [her] current treatment plan." (R. 566).

On January 18, 2014, Plaintiff presented to the Berkeley Medical Center for a CT scan of her lumbar spine. (R. 569). The results of the CT scan showed: "[(1)] moderate disk bulge at L4-L5, causing mild spinal stenosis[; (2)] . . . mild bilateral neural foraminal narrowing . . . [and (3)] a mild disk bulge at [the] L5-S1 level without any [resulting] spinal stenosis or neural foraminal narrowing." (Id.).

Plaintiff continued to seek treatment from Dr. Varga in 2014. On February 25, 2014, Dr. Varga documented that aquatic therapy "didn't help" Plaintiff. (R. 572). Dr. Varga further documented that Plaintiff's left hand was still going numb and that her arm was sore, which was waking her up at night "a lot." (R. 570). On May 27, 2014, Dr.

Varga recorded that Plaintiff requested to try tramadol again and that he had prescribed the medication. (R. 537, 575). On August 27, 2014, Dr. Varga documented that Plaintiff was continuing to have problems with restless legs at night and that Klonopin only helped at times. (R. 576). Dr. Varga further documented that Plaintiff was experiencing more problems with her left arm and that she was unable to hold a phone. (Id.). Dr. Varga continued Plaintiff's prescriptions of Klonopin, Flexeril and tramadol because "[they] seem[ed] to hold her most of the time." (R. 578). However, Dr. Varga hesitated to prescribe Norco, as requested by Plaintiff, pending a urine drug screen and a patient-physician narcotic contract. (Id.).

### 3. Medical Reports/Opinions

#### a. Disability Determination Explanation by Saima Noon, M.D., June 4, 2013

On June 4, 2013, Saima Noon, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Initial Level (the "Initial Explanation"). (R. 85-94). In the Initial Explanation, Dr. Noon concluded that Plaintiff suffers from the following severe impairments: peripheral neuropathy and disorders of the back, discogenic and degenerative. (R. 89). Additionally, Dr. Noon concluded that Plaintiff suffers from a non-severe impairment: aortic valve disease. (Id.).

In the Initial Explanation, Dr. Noon completed a physical residual functional capacity ("RFC") assessment of Plaintiff. (R. 90-92). During this assessment, Dr. Noon found that, while Plaintiff possesses no visual or communicative limitations, Plaintiff possesses exertional, postural, manipulative and environmental limitations. (Id.). Regarding Plaintiff's exertional limitations, Dr. Noon found that Plaintiff is able to: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds;

(3) stand and/or walk for approximately six hours in an eight-hour workday; (4) sit for approximately six hours in an eight-hour workday and (5) push and/or pull with no limitations. (R. 90). Regarding Plaintiff's postural limitations, Dr. Noon found that, while Plaintiff may occasionally climb ramps or stairs, balance, stoop, kneel, crouch and crawl, she should never climb ladders, ropes or scaffolds. (Id.).

Regarding Plaintiff's manipulative limitations, Dr. Noon determined that, while Plaintiff is able to reach in any direction, handle items and feel sensations without limitation, she is limited in her fingering ability. (R. 91). Finally, regarding Plaintiff's environmental limitations, Dr. Noon found that, while Plaintiff need not avoid humidity, noise or "[f]umes, odors, dusts, gases, poor ventilation, etc.," she should avoid concentrated exposure to extreme cold, extreme heat, wetness, vibration and hazards such as machinery and heights. (Id.). After completing the RFC assessment, Dr. Noon determined that, subject to the above limitations, Plaintiff is able to perform light exertional work. (R. 93).

### b. Disability Determination Explanation by Fulvio Franyutti, M.D., August 7, 2013

On August 7, 2013, Fulvio Franyutti, M.D., a state agency medical consultant, prepared the Disability Determination Explanation at the Reconsideration level (the "Reconsideration Explanation"). (R. 107-18). In the Reconsideration Explanation, Dr. Franyutti reviewed Dr. Noon's findings from the Initial Explanation. (See id.). While Dr. Franyutti affirmed most of Dr. Noon's findings, Dr. Franyutti offered one point of dissension. (See id.). Specifically, Dr. Franyutti opined that, in addition to the severe impairments diagnosed by Dr. Noon, Plaintiff suffers from severe dysfunction of the major joints. (R. 112).

**C.  Testimonial Evidence**

During the administrative hearing on October 14, 2014, Plaintiff testified regarding her work history. Plaintiff has worked for a grocery store and as an activities assistant director for a nursing home. (R. 35). She has also worked multiple temporary jobs, including for various warehouses, FedEx Corporation and a phone book company. (R. 36). Most recently, she has worked as a sandwich preparer. (R. 37). While she worked as a sandwich preparer for "about a year and a few months," she stopped working in April of 2013 because she experienced difficulty standing for long periods of time, climbing, bending and squatting. (R. 37-38).

Plaintiff testified that she suffers from multiple physical ailments that preclude her from working because they result in standing, lifting, kneeling and bending limitations. (See R. 49). These ailments include a neck impairment, bilateral arm impairment and back impairment. (R. 38, 43). Regarding Plaintiff's neck impairment, Plaintiff underwent neck surgery in August of 2009. (R. 38). Afterwards, she returned to work. (Id.). However, she continued to experience difficulty turning her neck and a "popping" when she turned her neck a certain way. (Id.). She now experiences stiffness in her neck "every few days" that lasts for "[a] couple days." (R. 39). The stiffness is worse upon exertion. (Id.). When the stiffness occurs, Plaintiff lays down "as flat as [she] can." (Id.). Every three to four days, she experiences sharp neck pain. (R. 40).

Regarding her bilateral arm impairment, Plaintiff experiences numbness in her arms "almost every day." (Id.). The numbness prevents her from lifting items heavier than eight to ten pounds and from carrying or holding on to items for long periods of time. (R. 41-42). Due to these limitations, she occasionally drops items and requires ten

12

to fifteen minutes of rest after using her arms for ten to fifteen minutes. (Id.). In July of 2013, Plaintiff underwent surgery on her left arm, which temporarily stopped her symptoms. (R. 41). However, almost a year after the surgery, her symptoms returned. (Id.).

Regarding Plaintiff's back impairment, Plaintiff "[can] . . . feel the disks . . . bulging out." (R. 43). She also experiences a cold, numb feeling across her lower back intermittently throughout the day and sharp pains radiating into her feet every other day. (Id.). Due to this impairment, she cannot bend over, stand for longer than one to one-and-a-half hours or walk for longer than a half-hour. (R. 43-45). While surgery is not recommended at this time, Plaintiff has tried physical therapy for her impairment. (R. 44-45).

Finally, Plaintiff testified regarding her routine activities. Every day, Plaintiff awakens and spends one hour trying "to get [her]self . . . moving." (R. 48). Once she gets moving, she performs housework for fifteen-to twenty-minute intervals, resting for ten to fifteen minutes between intervals. (R. 47-48). Her household chores include washing dishes and washing laundry. (R. 48). Every few days, she visits with friends. (R. 48-49).

**D.      Vocational Evidence**

**1.  Vocational Testimony**

Mark Hileman, an impartial vocational expert, also testified during the administrative hearing. (R. 50-57). Initially, Mr. Hileman testified regarding the characteristics of Plaintiff's past relevant work. (R. 51). Regarding Plaintiff's most recent job as a deli clerk, Mr. Hileman characterized the position as a light-exertional, semi-

skilled position. (Id.). Mr. Hileman characterized Plaintiff's previous jobs as an activities aide for a nursing home, general warehouse laborer/worker and food prep and sandwich maker as medium and semiskilled, medium and unskilled and medium and unskilled, respectively. (Id.). After detailing the characteristics of Plaintiff's past relevant work, Mr. Hileman declared that Plaintiff does not possess any transferable job skills. (Id.).

After Mr. Hileman described Plaintiff's past relevant work, the ALJ presented several hypothetical questions for Mr. Hileman's consideration. In the first hypothetical question, the ALJ asked:

> [Assume] a hypothetical individual, somebody who's a younger person, less than 50 years old, somebody with a high school education, somebody with the work experience that you just described. Let's further assume . . . somebody who's at the light level, who can lift 20 pounds occasionally, 10 pounds frequently; who can stand or walk [for] about six hours, and can sit for up to six hours in an eight-hour day; however, they can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; occasionally balance, stoop, kneel, crouch, or crawl. They . . . need to avoid concentrated exposure to cold, heat, or wetness, to vibration, and to hazards, like moving machinery and heights. They can frequently finger . . . [and engage in] fine manipulation.
>
> So given those limitations, would such an individual be able to perform [Plaintiff's] past work?

(R. 52). Mr. Hileman responded in the negative but stated that such an individual could instead work as a counter attendant, office mail clerk or marker/merchandise marker.

(R. 52-53). The ALJ then presented his second hypothetical:

> [A]ssume the individual is really at the sedentary level because they can lift 10 pounds occasionally; they can stand or walk for two hours, and they can sit for up to six hours.
>
> Leaving in play all of the other limitations we just talked about and making that adjustment, would there be work in the economy?

(R. 53). In response to this hypothetical, Mr. Hileman stated that such an

individual could work as a call-out operator, food checker or addressing clerk.

(Id.). The ALJ then expanded on the second hypothetical, adding the limitation

that the individual be restricted to occasional fingering. (R. 54). Mr. Hileman

answered that such an individual could still work as a call-out operator or could

work as a carting machine operator or reception clerk. (Id.). Finally, the ALJ

asked:

> [L]et's take these limitations that we just talked about, but let's assume
> that the individual can stand or walk for less than two hours, and they can
> sit for less than six hours, and the reason is that they're going to have
> fatigue and pain . . . such that they're going to be off task, distracted from
> their work . . . [for] 20 percent of a normal workday. They're going to be
> absent from their workplace then at least twice a month. They're going to
> need work that doesn't involve production rate or pace work. They're not
> going to be able to keep up with production.
>
> Given those limitations, would there be work in the national or regional
> economy?

(R. 54-55). Mr. Hileman responded that such an individual would not be

employable. (R. 55). After answering the ALJ's hypothetical questions, Mr.

Hileman stated that his testimony was consistent with the Dictionary of

Occupational Titles ("DOT"). (Id.).

Plaintiff's counsel, Mr. Shea, also presented questions for Mr. Hileman's

consideration during the administrative hearing. (R. 55-57). First, Mr. Shea asked:

> I want to use hypothetical number three if you will, which was the one with
> . . . sedentary [exertion and] occasional fingering . . . . [I]f we were to also .
> . . add to that the handling could be no more than occasional, would that
> have any impact on the person's ability to do any of the occupations
> you've identified?

(R. 55-56). In response to Mr. Shea's question, Mr. Hileman responded that the added limitation would "significantly reduce the occupations at the sedentary level." (R. 56). Second, Mr. Shea asked to what extent absenteeism is generally allowed by employers, to which Mr. Hileman stated that employers typically allow up to two days of absences per month. (Id.). Third, Mr. Shea asked how many breaks employers generally allow of their employees, to which Mr. Hileman stated that employers typically allow their employees to take a fifteen-minute break in the morning and afternoon and a half-hour to an hour lunch break. (Id.). Finally, Mr. Shea asked what would occur if an employee required more than the allotted number of breaks. (R. 57). In response to this question, Mr. Hileman declared:

> I mean, you can certainly . . . take a quick bathroom break here or there, you know, an extra [break] in the morning or afternoon, but I think if you're . . . doing anything more than that on a regular basis, it's not going to be tolerated by a lot of employers.

(Id.).

### 2. Disability Reports

On April 15, 2013, Plaintiff submitted a Disability Report. (R. 277-86). In this report, Plaintiff indicated that she is unable to work due to the following ailments: (1) a bulging disc and pinched nerve; (2) spinal stenosis and (3) carpal tunnel syndrome. (R. 278). She further indicated that she stopped working on April 4, 2013, "[b]ecause of [her] condition(s)." (Id.).

After the filing of the Disability Report, two Disability Report-Appeal forms were submitted. (R. 299-04, 320-25). On July 10, 2013, Plaintiff reported that her carpal tunnel syndrome had worsened and that she was scheduled for carpal tunnel surgery. (R. 299). She also reported that she had been diagnosed with degenerative joint

disease in her right hip and "a small leak" in one of her heart valves. (Id.). She declared

that, as a result of these changes in her condition, she "need[s] to stop more often to

rest when standing or walking" and that her arms "have gotten . . . weaker." (R. 302).

However, she further declared that she "[is] able to care for [her]self personally." (Id.).

On September 10, 2013, Robert Sheeran, reporting on Plaintiff's behalf, stated

that Plaintiff had undergone carpal tunnel surgery but that, despite the surgery, her arm

continues to experience a burning sensation and numbness. (R. 320). Additionally, Mr.

Sheeran stated that "[Plaintiff] still ha[s] limitations [of the] neck. [She] is unable to

squat, kneel, bend due to [her] legs and back. . . . Also unable to walk for a long period

of time." (Id.). Due to these limitations, Mr. Sheeran declared that Plaintiff requires more

time to complete tasks/activities and that she tires quickly. (R. 323).

**E.    Lifestyle Evidence**

**1.  First Adult Function Report**

On April 22, 2013, Plaintiff submitted her first Adult Function Report. (R. 287-94).

In this report, Plaintiff declares that she is unable to work because:

> I'm unable to stand for long periods of time. My arms have pain that
> shoots down them and goes numb. After walking long and short distances
> I have to stop and take breaks while walking because my legs get tired
> and feel heavy like they are going to give out on me.

(R. 287).

Plaintiff describes how her impairments impact her ability to perform some

activities but not others. For some activities, Plaintiff requires minimal or no assistance.

For example, Plaintiff is able to perform her own personal care. (R. 288). She is able to

prepare her own meals, including "complete meals."(R. 289). She is able to perform

housework and wash laundry, although she needs help with lifting. (Id.). She is able to

care for her two pet dogs. (R. 288). She is able to operate a motor vehicle independently and shop in stores. (R. 290). She can pay bills, count change, handle a savings account and use a checkbook/money orders. (Id.). She can use a computer and does so on a daily basis. (R. 291). She is able to spend time with others and goes to her physician's office and church on a regular basis. (Id.). Finally, she can pay attention "for as long as needed," complete tasks, follow written and spoken instructions and get along with authority figures. (R. 292-93).

While Plaintiff is able to perform some activities, she describes how others prove more difficult due to her impairments. Plaintiff's impairments affect her abilities to: lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, memorize information[5] and use her hands. (R. 292). She is limited to lifting only eight to ten pounds. (Id.). She is also limited to walking a distance of one hundred feet before requiring a five-minute rest. (Id.). She experiences difficulty standing for long periods of time. (Id.). Her impairments also cause her to experience difficulty sleeping through the night. (R. 288).

Finally, Plaintiff details her daily activities. On a typical day, Plaintiff awakens and watches the news. (Id.). After watching the news, she performs housework "one section at a time." (Id.). She then goes outside and walks "a little bit" before laying down "for awhile" in the afternoon. (Id.). After she lays down, she goes back outside and walks "a

---

[5] On May 20, 2013, Jill Lilly, of the Disability Determination Section ("DDS") office in Clarksburg, West Virginia, completed a Report of Contact form. (R. 295). On this form, Ms. Lilly documented that, although Plaintiff complained of memory loss in her Adult Function Report, "[h]er forgetfulness is related to pain." (Id.). Ms. Lilly further documented that Plaintiff "has never been seen or treated for a mental impairment" and that, "[i]f her pain were resolved, she would not have a mental impairment that affected her work." (Id.).

little more." (Id.). In the evening, she eats dinner, watches television and goes to bed. (R. 294). Her daily medications consist of Flexeril and Lortab.[6] (Id.).

### 2. Personal Pain Questionnaire

On July 17, 2013, Plaintiff submitted a Personal Pain Questionnaire. (R. 305-09). In this questionnaire, Plaintiff declares that she suffers from pain in her neck and arms, legs, lower back and right hip. (R. 305). Regarding the pain in her neck and arms, Plaintiff characterizes the pain as aching, cramping and continuous in nature. (Id.). She explains that using her arms and hands for long periods of time exacerbates the pain and that resting her arms and hands relieves the pain. (Id.). She further explains that her neck pain decreases her neck's range of motion and that her arm pain prevents her from extending her arms or holding objects for long periods of time. (R. 305, 309).

Regarding Plaintiff's bilateral leg pain, Plaintiff characterizes the pain as aching, throbbing and continuous in nature. (Id.). She explains that her pain is caused by spinal stenosis and that "taking breaks and resting" relieves the pain. (R. 307). She further explains that this pain causes her to experience difficulty walking. (Id.).

Regarding Plaintiff's lower back pain, Plaintiff characterizes the pain as aching, burning, cramping and continuous in nature. (R. 307-08). She explains that, like her leg pain, her lower back pain is caused by spinal stenosis. (R. 308). She further explains that resting and taking her pain medication eases the pain. (Id.).She states that her back pain prevents her from standing for long periods of time. (Id.).

Finally, regarding Plaintiff's right hip pain, Plaintiff characterizes the pain as cramping and continuous in nature. (R. 309). She states that this pain prevents her from

---

[6] In addition to medications, Plaintiff is prescribed a hearing aid, eyeglasses and a brace/splint. (R. 293).

walking normally. (Id.). To treat her various pains, Plaintiff declares that she is prescribed Flexeril, hydrocodone and Klonopin, which she describes as "[s]ometimes" effective.[7] (R. 306-08). She further declares that these medications cause her to feel drowsy. (Id.).

### 3. Second Adult Function Report

On July 17, 2013, Plaintiff submitted her second Adult Function Report. (R. 310-17). In this report, Plaintiff explains that she has become more limited in her physical abilities since her last Adult Function Report. For example, Plaintiff declares:

> When squatting have hard time getting up. When bending it cause[s] pain and numbness in my back. When standing always changing positions need to sit. When reaching my arms become tired and I need to put them down. I am unable to walk long distances without stopping to rest, when sitting need to change position often. When I kneel have hard time getting up. I have hard time concentrating forget easy. I don't have very good grip on things, I drop things on occasion. I can lift around 10 – 15 lbs. Stair climbing I am unable to do due to balance.

(R. 315, 317). Due to these increased limitations, Plaintiff states that she no longer prepares complete meals but only sandwiches and frozen dinners. (R. 312). She further states that, while performs some housework, including dusting, washing "some" laundry and washing "a few" dishes, she requires "a few hours" to complete these activities. (Id.).

## IV.    THE FIVE-STEP EVALUATION PROCESS

To be disabled under the Social Security Act, a claimant must meet the following criteria:

---

[7] Plaintiff submitted two forms entitled "Claimant's Medications," on which she updated her prescribed medications. (R. 326, 334). On June 10, 2014, the most recent form, Plaintiff amended her list of daily medications to include: (1) Flexeril for muscle spasms; (2) tramadol for pain and (3) Klonopin "to aid in sleeping." (R. 334).

[The] individual . . . [must have a] physical or mental impairment or impairments . . . of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. . . . '[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. §§ 423(d)(2)(A) & 1382c(a)(3)(B). The Social Security Administration uses

the following five-step sequential evaluation process to determine whether a claimant is

disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement [of twelve months] . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, [your RFC] . . . is evaluated "based on all the relevant medical and other evidence in your case record . . . ."]

(iv) At the fourth step, we consider our assessment of your [RFC] and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. §§ 404.1520 & 416.920. In steps one through four, the burden is on the

claimant to prove that he or she is disabled and that, as a result of the disability, he or she is unable to engage in any gainful employment. Richardson v. Califano, 574 F.2d 802, 804 (4th Cir. 1978). Once the claimant so proves, the burden of proof shifts to the Commissioner at step five to demonstrate that jobs exist in the national economy that the claimant is capable of performing. Hicks v. Gardner, 393 F.2d 299, 301 (4th Cir. 1968). If the claimant is determined to be disabled or not disabled during any of the five steps, the process will not proceed to the next step. 20 C.F.R. §§ 404.1520 & 416.920.

## V.   ADMINISTRATIVE LAW JUDGE'S DECISION

Utilizing the Social Security Administration's five-step sequential evaluation process, the ALJ found that:

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2015 (Exhibit B5D/2).

2.  The claimant engaged in substantial gainful activity during the following periods: from the third quarter of 2012 to the first quarter of 2013 (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3.  The claimant has the following severe impairments: carpal tunnel syndrome, cervical spine degenerative disc disease status post-surgery, aortic valve disease, lumbar spine stenosis, right hip arthritis, and periodic limb movement disorder (20 CFR 404.1520(c) and 416.920(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the [RFC] to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b). However, the claimant can never climb ladders, ropes, or scaffolds, can occasionally climb ramps or stairs, balance, stoop, kneel, crouch, or crawl, can frequently finger items with fine manipulation, and should

avoid concentrated exposure to cold, heat, wetness, vibration, and hazards.

6.      The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.      The claimant was born on June 7, 1971[,] and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from February 13, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(R. 18-25).

## VI.      DISCUSSION

### A.      Contentions of the Parties

In her Motion for Summary Judgment, Plaintiff contends that the Commissioner's decision contains errors of law and is not supported by substantial evidence. (Pl.'s Mot. at 1). Specifically, Plaintiff contends that the ALJ improperly assessed her credibility. (Pl.'s Br. in Supp. of her Mot. for Summ. J. ("Pl.'s Br.") at 3, ECF No. 11). Plaintiff requests that the Court reverse the Commissioner's decision or, in the alternative, remand the case for further proceedings. (Id. at 9; Pl.'s Mot. at 1).

Alternatively, Defendant contends in her Motion for Summary Judgment that the Commissioner's decision is supported by substantial evidence. (Def.'s Mot. at 1). To counter Plaintiff's argument, Defendant contends that the ALJ properly determined Plaintiff's credibility and that the credibility determination is supported by substantial evidence. (Def.'s Br. in Supp. of her Mot. for Summ. J. ("Def.'s Br.") at 6, ECF No. 14). Defendant requests that the Court affirm the Commissioner's decision. (Def.'s Mot. at 1).

**B.    Scope of Review**

In reviewing an administrative finding of no disability, the scope of review is limited to determining whether the ALJ applied the proper legal standards and whether the ALJ's factual findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). A "factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Likewise, a factual finding by the ALJ is not binding if it is not supported by substantial evidence. Richardson v. Perales, 402 U.S. 389, 401 (1971). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Id. (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). When determining whether substantial evidence exists, a court

must "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ's]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005).

**C.      Analysis of the Administrative Law Judge's Decision**

Plaintiff argues that the ALJ erred in determining that Plaintiff is "not entirely credible." (Pl.'s Br. at 3-4). Defendant argues that the ALJ properly assessed Plaintiff's credibility and that the ALJ's credibility determination is supported by substantial evidence. (Def.'s Br. at 6-13).

"[T]he determination of whether a person is disabled by pain or other symptoms is a two-step process." See Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996); see also 20 C.F.R. § 404.1529(c)(1) (2011); SSR 96-7p, 1996 WL 374186, at *2 (July 2, 1996). First, the ALJ must expressly consider whether the claimant has demonstrated, through objective medical evidence, that a medical impairment exists that is capable of causing the degree and type of pain alleged. See Craig, 76 F.3d at 594. Second, the ALJ must consider the credibility of the claimant's subjective allegations of pain in light of the entire record. Id.

Social Security Ruling ("SSR") 96-7p[8] sets out several factors, in addition to the objective medical evidence, for an ALJ to consider when assessing the credibility of a claimant's subjective symptoms and limitations, including:

1.      The individual's daily activities;

2.      The location, duration, frequency, and intensity of the individual's pain or other symptoms;

---

[8] On March 16, 2016, SSR 96-7p was superseded by SSR 16-3p. Nevertheless, because SSR 16-3p was not issued until after the date of the ALJ's decision, the undersigned will review whether the ALJ's decision comports with SSR 96-7p, the ruling that was applicable at the date of the ALJ's decision.

3.      Factors that precipitate and aggravate the symptoms;

4.      The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.      Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.      Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for [fifteen] to [twenty] minutes every hour, or sleeping on a board), and

7.      Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). An ALJ need not document specific findings as to each factor. Wolfe v. Colvin, No. 3:14-CV-4, 2015 WL 401013, at *4 (N.D. W. Va. Jan. 28, 2015). However, the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, 1996 WL 374186 at *2. Because the ALJ has the opportunity to observe the demeanor of the claimant, the ALJ's observations concerning the claimant's credibility are given great weight. Shively, 739 F.2d at 989-90. This Court has determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011). If the ALJ meets his or her basic duty of explanation, then "an ALJ's credibility determination [will be reversed] only if the claimant can show [that] it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va.

Feb. 3, 2010) (quoting <u>Powers v. Apfel</u>, 207 F.3d 431, 435 (7th Cir. 2000)).

In the present case, the undersigned finds that the ALJ properly followed the two-step process when determining that Plaintiff is "not entirely credible." (R. 20). Initially, the ALJ determined that Plaintiff had proved that she suffers from medical impairments that "could reasonably be expected to cause the alleged symptoms." (<u>Id.</u>). Then, after examining the factors outlined in SSR 96-7p, the ALJ further determined that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible" in light of the entire record. (<u>Id.</u>).

### i.   Plaintiff's Daily Activities

The ALJ considered Plaintiff's daily activities (factor one) when making her credibility determination. (R. 22). Specifically, the ALJ noted that:

> [Plaintiff] engaged in substantial gainful activity at Pilot Travel from the third quarter of 2012 through the first quarter of 2013. [Plaintiff] testified she stopped working at Pilot Travel because she could not stand/walk or squat, but said she could stand/walk one to two hours per testimony. . . .
>
> [Plaintiff also] reported working for Subway from January 2012 through the first quarter of 2013. [She] said her job required making sandwiches, lifting, bending, and standing. [She] also reported no problems with personal care and said she cleaned for a few hours or took breaks. [She] stated she did the laundry but had help with lifting. [She] indicated she was able to drive a car, ride in a car, shop, watch television, care for two dogs, cook complete meals, manage money, listen to music, use the computer every other day, attend church, sit and talk, watch movies, and go to doctor appointment.

(R. 20, 22) (internal citations omitted). Therefore, the ALJ concluded that Plaintiff's "daily activities . . . are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (R. 22).

Plaintiff argues that the ALJ mischaracterized her testimony. (Pl.'s Br. at 6). Specifically, Plaintiff argues that she did not testify that she stopped working at Pilot

Travel because she could not stand, walk or squat in any capacity but that "she could not perform the amount of bending, squatting, or standing required by her position." (Id.). Thus, Plaintiff argues that her testimony that she is able to walk one to two hours "d[oes] not contradict her statements." (Id.). Plaintiff's exact testimony is as follows: "I had to leave [Pilot Travels] because I just couldn't take the -- like, if I had to climb, or the bending, the squatting, and just the standing because again, you got to stand for the entire shift that you were there." (R. 37). The undersigned notes that this testimony is unclear as to whether Plaintiff was unable to climb, bend or squat in any capacity or whether she was simply not able to meet the physical requirements of the position.

Nevertheless, the undersigned finds that any error on the part of the ALJ in interpreting Plaintiff's testimony is harmless in nature. See Emigh v. Comm'r of Soc. Sec., No. 3:14-CV-36, 2015 WL 545833, at *21 (N.D. W. Va. Feb. 10, 2015) ("The court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination."). The ALJ clearly did not discredit Plaintiff's subjective statements solely because of his interpretation of her testimony. Therefore, any error in interpreting Plaintiff's testimony is inconsequential to the ultimate nondisability determination and Plaintiff's argument fails.

Plaintiff also argues that the ALJ erred by using her daily activities to discredit her when "[t]here is no indication that any activity performed by [her] was performed on any type of sustained basis." (Pl.'s Br. at 4-8). The undersigned disagrees. The ALJ stated that Plaintiff's "daily activities . . . are not limited to the extent one would expect, given [her] complaints of disabling symptoms and limitations." This statement makes clear that

the ALJ did not use Plaintiff's daily activities to show that she performed activity at a significant gainful activity level. Instead, the ALJ used Plaintiff's daily activities to show that her statements of severe symptoms and limitations were not plausible because, if her subjective statements were true, then she would not be able to perform the listed daily activities. Moreover, the undersigned notes that the ALJ was required by SSR 96-7p to consider Plaintiff's daily activities when evaluating her credibility. SSR 96-7p, 1996 WL 374186, at *3. Therefore, Plaintiff's argument lacks merit.

### ii.    Plaintiff's Pain and Other Symptoms

The ALJ also reviewed the location, duration, frequency and intensity of Plaintiff's pain and other symptoms (factor two) and the factors that precipitate and aggravate those symptoms (factor three). Regarding Plaintiff's symptoms, the ALJ noted that Plaintiff complains of, *inter alia*: right hip pain, carpal tunnel syndrome, low back pain and neck pain. (R. 21). Regarding factors that precipitate/aggravate Plaintiff's symptoms, the ALJ documented that physical activity exacerbates her pain, including bending, lifting, walking long distances and standing for long periods of time. (See R. 21-22).

### iii.    Plaintiff's Medications

The ALJ discussed the medication that Plaintiff is prescribed for her symptoms (factor four). For example, the ALJ noted that Plaintiff routinely takes Flexeril, tramadol and Klonopin. (R. 22). The ALJ then noted that Plaintiff's medications "are modest given her allegations, but [are] consistent with medical evidence findings." (Id.).

### iv.    Other Treatment and Measures Used to Relieve Symptoms

Next, the ALJ reviewed treatment other than medication that Plaintiff has

received for relief of her symptoms (factor five), as well as measures Plaintiff uses to relieve her symptoms on her own (factor six). Regarding treatment other than medication that Plaintiff has received for her symptoms, the ALJ noted that Plaintiff has undergone several surgeries, including a cervical fusion surgery in 2009 and ulnar nerve decompression of the left elbow and carpal tunnel release of the left wrist in 2013. (R. 20-21). The ALJ also noted that Plaintiff has participated in physical/pool therapy. (R. 21). As for measures Plaintiff uses to relieve her symptoms on her own, the ALJ noted that Plaintiff was instructed to use ice/heat for her back pain as needed. (Id.).

### v. Other Factors

Finally, the ALJ considered the objective medical evidence and Plaintiff's receipt of unemployment benefits when analyzing Plaintiff's credibility (factor seven). Regarding the objective medical evidence, the ALJ noted that an X-ray of Plaintiff's right hip showed evidence of arthritis and that nerve conduction studies showed bilateral median neuropathy at the wrists, ulnar neuropathy across the elbows and chronic bilateral multilevel radiculopathies. (Id.). The ALJ also noted that:

> [O]bjective findings on examinations from the Panhandle Neurology Center from September 2011 to May 2014 revealed she had a normal gait and was able to stand without difficulty. A CT of the lumbar spine on January 18, 2014, demonstrated only moderate disc bulge at L4-L5, causing mild spinal stenosis; mild lateral neural foraminal narrowing; and mild disc bulge at L5-S1 without any spinal stenosis or neural foraminal narrowing. Motor examinations showed 5/5 without atrophy, abnormal tone, or movements. The extremities were symmetrical without pulse deficits, edema, or cyanosis. Moreover, general observations supported she was well nourished, in no acute distress, clean, and cooperative.

(R. 21-22). Therefore, the ALJ concluded that Plaintiff's subjective statements "are not entirely credible when compared with the objective medical evidence." (R. 20).

Regarding Plaintiff's receipt of unemployment benefits, the ALJ noted that,

although Plaintiff "testified that she did not collect unemployment benefits in 2013, . . . queries showed [that] she claimed unemployment benefits of $1,350 for the second quarter of 2013, $1,950 for the third quarter of 2013, and $1,529 [for] the fourth quarter of 2013." (R. 20). The ALJ further noted that to obtain unemployment benefits, "one must certify that he is ready, willing, and able to work." (Id.). While the ALJ stated that Plaintiff's receipt of unemployment benefits was not "dispositive," he concluded that the receipt of such benefits was "counterpoise[d] to her claim of total debility." (Id.).

Plaintiff argues that the ALJ applied an improper legal standard when he "required that [she] establish the intensity, persistence, and limiting effects of her pain by objective medical evidence." (Pl.'s Br. at 6). The undersigned finds that this argument lacks merit. SSR 96-7p states that, when considering a claimant's credibility, an ALJ "must consider *in addition to the objective medical evidence*" the seven identified factors. SSR 96-7p, 1996 WL 374186, at *3 (emphasis added). The Fourth Circuit has provided additional counseling on the role of objective medical evidence in a claimant's credibility assessment:

> [O]nce a medically determinable impairment which could reasonably be expected to produce the pain alleged by the claimant is shown by objective evidence, the claimant's allegations as to the severity and persistence of her pain may not be dismissed merely because objective evidence of the pain itself . . . [is] not present to corroborate the existence of pain. That is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. [However,] a claimant's allegations about her pain may not be discredited *solely* because they are not substantiated by objective evidence of the pain itself or its severity.

Craig v. Chater, 76 F.3d 585, 595 (4th Cir. 1996) (emphasis added). In the present case, the ALJ properly considered the objective medical evidence when assessing

Plaintiff's credibility. It is also clear that the ALJ did not discredit Plaintiff's subjective statements solely because they were not substantiated by the objective medical evidence. To the contrary, the ALJ also used, *inter alia*, Plaintiff's daily activities, conservative medications and treatment and receipt of unemployment benefits to discredit her subjective statements. Therefore, Plaintiff's argument is meritless.

Plaintiff further argues that the ALJ erred in using her receipt of unemployment benefits to discredit her. (Pl.'s Br. at 6-7). Plaintiff explains that, to be eligible for SSI benefits, she was required to "apply for all other benefits for which [she could be] eligible," including unemployment insurance benefits. (Id. at 7) (quoting 20 C.F.R. § 416.210). However, Social Security Administration Memorandum 10-1258 states:

> This is a reminder of the policy concerning receipt of unemployment insurance benefits. Receipt of unemployment benefits does not preclude the receipt of Social Security disability benefits. The receipt of unemployment benefits is only one of many factors that must be considered in determining whether the claimant is disabled. See 20 CFR 404.1512(b) and 416.912(b).

Mem. 10-1258 (Aug. 9, 2010). Therefore:

> On the issue of credibility, an application for unemployment benefits is . . . a piece of significant evidence. . . . [T]o apply for unemployment benefits, a claimant must 'certify that he [is] physically and mentally able, willing, and available to work.' Such a certification contradicts [a] representation that [a claimant's] symptoms were so intense and persistent, he was unable to perform basic work-related functions. As such, it is a relevant piece of the credibility assessment."

Vanduzer v. Colvin, No. 2:14-CV-17230, 2015 WL 4715974, at *21 (S.D. W. Va. Aug. 7, 2015) (internal citations omitted). The ALJ, consequently, did not err in considering Plaintiff's receipt of unemployment benefits during her credibility assessment. See also Baker v. Colvin, 2015 WL 3562164, at *14 (D.S.C. Jun. 5, 2015) (citing Black v. Apfel, 143 F.3d 383 (8th Cir.1998) (stating that acceptance of unemployment benefits, which

entails an assertion of the ability to work, is facially inconsistent with a claim for disability)); Martin v. Colvin, 2015 WL 1346990, at *4 (E.D.N.C. Mar. 24, 2015) ("Although the 'receipt of unemployment compensation does not in itself prove ability to work,' . . . numerous courts within this circuit have held that the acceptance of unemployment benefits may weigh against an individual's credibility"); Bird v. Colvin, 2015 WL 1062040, at *9 (D. Md. Mar. 10, 2015) (finding that consideration of unemployment benefits was proper in making a credibility finding).

### vi. Substantial Evidence Supports the ALJ's Credibility Determination

After a careful review of the ALJ's decision and the evidence of record, the undersigned finds that the ALJ's credibility determination is sufficiently specific to make clear his reasoning in finding Plaintiff not entirely credible. Thus, the burden was on Plaintiff to show that the ALJ's credibility determination is patently wrong. Plaintiff failed to meet this burden. Consequently, the undersigned accords the ALJ's credibility determination the great weight that it is entitled.

## VII.  RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying Plaintiff's claims for DIB and SSI benefits is supported by substantial evidence. Accordingly, I **RECOMMEND** that Plaintiff's Motion for Summary Judgment (ECF No. 10) be **DENIED**, Defendant's Motion for Summary Judgment (ECF No. 13) be **GRANTED**, the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections

identifying the portions of the Report and Recommendation to which objections are made and the basis for such objections. A copy of such objections should also be submitted to the Honorable Gina M. Groh, Chief United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841, 845-48 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140, 155 (1985).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted this 3rd day of March, 2017.

ROBERT W. TRUMBLE
UNITED STATES MAGISTRATE JUDGE